### In re BABER.

(District Court, E. D. Tennessee, W. D. August 28, 1902.)

### No. 104.

1. BANKRUPTCY—PROCEDURE BEFORE REFEREES.

On an application of a trustee in bankruptcy to the court for advice as to whether he should file a petition to have the claim of a creditor expunged for fraud, the referee has no authority to hear and determine the subject-matter of such petition on the merits.

**2.** SAME—TRUSTEES--APPLICATION FOR ADVICE.  ·

An application by a trustee for the direction of the court as to whether he shall sign and file a proposed petition against a creditor, prepared by counsel, which alleges that such creditor fraudulently proved his claim as unsecured, and received dividends thereon, while at the same time it was prosecuting a suit in the state courts to enforce collateral security held for the debt, should be denied, and the trustee left to act in the matter on his own responsibility, aided by the advice of counsel, and, if he desires, by that of the creditors.

**3.** SAME—POWERS AND DUTIES OF TRUSTEES.

While a trustee in bankruptcy acts in a certain sense under the direction of the court, he is vested by the law with the title to the bankrupt's estate, and charged with duties with respect to the same which he is required to perform with intelligence and on his own responsibility. He may employ counsel, using such judgment as an ordinary man would in the transaction of his own business, and may apply to the creditors for authoritative advice and instructions upon questions of expediency, or for assistance with money to conduct litigation if without funds; but he is not entitled to devolve upon the court the responsibility of directing his actions where his legal duty is plain.

In Bankruptcy.   On petition to review action of referee.

This is a petition to review the action of the referee on the application of the trustee for instructions by the court. The adjudication of the bankrupt was made October 30, 1900. At the first meeting of the creditors, December 2, 1900, the Bank of Huntingdon proved its claim as one without security for the sum of $2,172.76, and a brother of the cashier of the bank was elected trustee by the creditors. Subsequently, January 29, 1901, and June 12, 1901, ·the bank received as dividends on its claim an aggregate sum of $608.37. As a matter of fact, at the time the bank proved its claim without security, it held two notes of one Hardin, which had been secured by a purchase-money lien for land sold to Hardin by one McCracken. These notes were for $175 each, and had been assigned to the bank by Baber, the bankrupt, in March, 1900,—the particular date not being shown by the record,— as collateral security for the indebtedness then held by the bank against Baber, which was subsequently proved in bankruptcy as above stated. These collateral notes had never been paid, but subsequently to their assignment to the bank one Swift filed a bill in the state chancery court against Hardin, the maker of the notes, and others, the purport of which is not shown by the record; nor is the date of the filing of that bill shown by the record, but it may be inferred that it was subsequent to the adjudication of Baber in bankruptcy. However this fact may be, both Baber and the bank were made parties to that bill, and the bank filed a cross-bill to enforce the lien of its collateral security by a sale of the land. Neither is the precise date of the filing of this cross-bill shown, but it is to be inferred that it was subsequent to the adjudication in bankruptcy, and subsequent to the proof of debt by the bank in the bankruptcy proceedings. Because in the proceeding now under consideration it is stated "that in the pleadings in said cause in which the said decree was rendered no mention is made of the said bankrupt proceedings," the trustee in bankruptcy was not made a party to this bill, nor was he brought in after his appointment by the plaintiff in the bill, nor by the bank in its cross-bill. He and the bankruptcy proceedings were wholly ignored throughout the progress of the case in the chancery court and the supreme court of the state. The case was conducted as if the bankruptcy proceeding had had no effect upon the right or title of the bank or Baber to the collateral notes. On the 14th of February, 1902, a final decree was made in the chancery court, which declared a lien in favor of the bank for $373.79, the aggregate amount of the notes, and enforced the same by a decree of sale if the money should not be paid in 30 days from the date of the decree. The decree states that no decree is rendered against

---

¶ 2. See Bankruptcy, vol. 6, Cent. Dig. § 346.

Baber, "because he is a nonresident," and the bill is dismissed as to him. This decree, on appeal, was subsequently affirmed by the supreme court. On the 14th day of August, 1902,—one year eight and a half months after his appointment,—the trustee appeared by Joseph R. Hawkins, Esq., an attorney, at a meeting of the creditors before the referee, and moved "to be allowed to file the following petition on behalf of the trustee." But, "stating that the trustee desired to be instructed and directed by the court whether or not he should file the same," it also appears that the trustee stated through said attorney that "the trustee would only sign and qualify to the petition, and file the same, when directed to do so by the court." It does not appear whether the said attorney, Hawkins, was employed by the trustee to take these proceedings against the bank, or whether he represented some of the creditors, and was endeavoring to reach the end desired through the acquiescence of the trustee. Neither does it appear how the bank came to enter its appearance to this application of the trustee to be allowed to file the petition. It does not appear that any process was issued against the bank to answer the petition, nor that any notice was issued to it to appear and resist or show cause against the application by the trustee for instructions from the court. The bank did not file any answer to the petition or otherwise make any issue upon it; nor did it make any response to the application for instructions and for leave to file the petition in the nature of a response to a rule to show cause. Nevertheless, the report of the referee states as follows: "Whereupon Geo. T. McCall, attorney for the Bank of Huntingdon, tendered to the trustee the recovery had on the alleged preferences, which tender was reduced to writing, and which is in words and figures following, to wit: 'This paper writing is a formal tender to the trustee of' the recovery 'in the case of Swift v. Hardin in favor of the bank upon the collateral notes,' less, however, 'all expenses of litigation, including attorney's fees.'" The petition of the trustee which it was proposed to file under the instructions of the court in that behalf sets out the facts as above related concerning the proof of the debt of the bank without security, and the institution and prosecution to enforce the lien of the collateral notes and the payment of the dividends to the bank without any disclosure by the bank to the trustee, the creditors, or the bankruptcy court of the fact that it held the collateral notes, or without any disclosure to the state courts of the fact of bankruptcy. The petition insists "that this was in such bad faith as to the rights of other creditors of the said Baber as should repel the said bank from your honor's court, and that said bank should be required to refund to your petitioner the entire amount so received by it for the benefit of other creditors of said Baber, and that said bank should be required to turn over to the petitioner all rights to the said two notes." The petition does not, in terms, pray, as it should have done, that the claim of the bank should be expunged and disallowed entirely; neither does it set up any facts to show that the assignment of the collateral notes by Baber to the bank was a fraudulent preference under the bankruptcy statute, such as that Baber was insolvent, either with or without the knowledge of the bank, at the time the collaterals were assigned to it. It does appear, however, from the report of the referee and the proof that was taken, that the assignment of the collateral notes to the bank by Baber was some time in March, 1900. This was at least seven months before the petition in bankruptcy was filed, and, if that be the correct date, it is difficult to see how the offer of the bank to surrender the collateral notes and the recovery thereon could be based on any notion of the surrender of a fraudulent preference under section 57g of the bankruptcy statute; nor why it should be assumed by the attorney for the bank and accepted by the referee as an obligation or duty of the bank to make such a tender or surrender. But the referee in his report bases his judgment of acceptance of the surrender by the trustee as for the best interest of the estate upon the ground that it is the full value of the securities to be estimated under section 57h of the statute. Yet under that section, as no surrender of these securities is required or contemplated, it seems that it must be inferred as one of the facts that the tender by the bank was by way of a voluntary surrender, and in the nature of a compromise offered to the trustee, and a compromise which the referee by his decision forces the trus-

tee to accept. Although there is no prayer in the petition offered by the trustee to be filed that the proof of debt made by the bank shall be expunged, there is a claim tantamount to such a prayer by the insistence above quoted that the bank should .be required to refund to the trustee the entire amount of dividends received by it; and, besides, there is a general prayer as follows: "Wherefore your petitioner prays that he be allowed to file this petition, and that a subpœna be issued and served upon the Bank of Huntingdon, as provided in the act of congress relating to bankrupt proceedings, and that your honor may make such rules and orders as may to your honor seem proper and right, and that such judgment or orders may be entered as will meet the ends of justice and the law in bankruptcy proceedings." The special relief that the petition demands is that the dividends be returned to the trustee, and "that said bank be required to turn over to the petitioner all rights to the said two notes," but the general prayer for relief is as above quoted.

The deposition of the cashier of the bank was taken by the parties, and offered in evidence in support of the application for instructions and for leave to file the petition and the answer and the cross-bill of the bank in the case of Swift v. Hardin et al., and the final decree of the chancellor in that case was also offered in evidence. This was a very unusual proceeding on such an application, and was wholly unauthorized in any view we can take of the case. But it is not necessary to further notice this proof in this statement of the facts, as the essential features appear in the proposed petition, and have already been related here

The conclusions of law and fact as found by the referee are as follows:

"It is conceded that at the time the bank filed its proofs of debt that it held the securities complained of in the petition, and held the securities as a collateral, as set out,—as a collateral to secure the indebtedness filed. Section 57 of the bankrupt act reads as follows: 'Proof and Allowance of Claims. A proof of claim shall consist of a statement under oath in writing signed by a creditor setting forth the claim, the consideration thereof, and whether any, and if so, what securities are held therefor, what payments have been made thereon and the sum claimed is justly owing from the bankrupt to the creditor.' Section 57, par. 'g,' of the act, reads as follows: 'The claims of creditors who received preferences shall not be allowed, unless such creditors shall surrender their preferences.' Section 57h of the act reads as follows: 'The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which the securities were delivered to such creditor or by such creditor and trustee and a dividend shall only be declared on the unpaid balance.' Form 33 (32 C. C. A. lxvii, 89 Fed. xliii) of the forms in bankruptcy, under which this claim was by the bank proven, it being of the form prescribed by the supreme court of the United States, as required by the act, requires the creditor to disclose any payments, set-offs, counterclaims, and what securities he holds, if any. The clear intention of these various sections are to provide an equitable distribution of the bankrupt's estate amongst his creditors, to prevent preferences, and to this end it is provided by the act that all liens, mortgages, deeds of trust that have been placed on the property within four months next preceding the adjudication of the bankrupt shall become void; and it is also clear that securities held for the protection of the debt filed shall be disclosed for the purpose of ascertaining whether it has been given as a preference, or, if a just and legal security, and not be made void by the act of bankruptcy, then that it may be taken into account, and reduce the debt filed to the extent of its value, and an easy mode provided for the ascertainment of its value, and, when so ascertained by the bankruptcy court, that it may be applied as a credit on the debt, and thus reduce the debt, and the pro rata be declared only on the remainder of the debt after the value of the securities are ascertained. The case at bar is not out of the ordinary, except in this: that the claim was filed on December 22, 1900, and allowed more than two years and eight months since, and the trustee at this late date makes the discovery of the securities so holden by the bank; and the further fact that the bank failed or omitted to disclose the securities so holden by the bank; and the further

fact that the bank failed or omitted to disclose the securities at the time of the filing of the claim. Two pro ratas have been declared and paid on the debt, and several meetings of the bankrupt's creditors have been held, since the filing of the claim. The proof also shows that the matter of said securities so holden by the bank was in litigation at Huntingdon, the home of the attorneys and the trustee all of the time of the pendency of this bankruptcy. The history of the bankruptcy proceedings before the referee being as follows: The matter was, on the 30th day of October, 1900, referred to the referee, the first meeting of creditors held on the 22d day of December, 1900, and on that date the claim of the bankrupt was proven and allowed; and the petition to review the claim of the bank is at this late day filed, offering no excuse for the failure to discover the error of the bank in failing to disclose these securities earlier. The total amount of the debts proven by the bank amounts to $2,172.76; total amount of dividends paid bank $608.37, the same having been paid in two pro ratas,—the first, 10 per cent., paid on the 29th of January, 1901, and the second, 18 per cent., paid 12th of June, 1901; total amount of securities held by the bank complained of $350, in two notes executed by A. S. Hardin to S. A. Hardin. Now, if these two notes had have been surrendered at the time proof of debt was filed, and the bankrupt court had have reduced them to cash, and had realized this face value, they would have obtained $350 for all creditors, if the same was void (holding which is not contended, nor charged in the petition); and we must infer that it was a valid security in the hands of the bank, and that when this court reduced it to cash it would had to have been applied on the bank's indebtedness to that extent, which would have left the sum of $1,822.76 as the remainder due the bank, upon which dividends would have been declared, which would have left the following results: Twenty-eight per cent. of $1,822.76 is $510.23. They were paid $608.37, or $98.14 too much, which amount of $98.14 would have been left in the general fund for distribution if the results above had have been reached by tendering of the securities in the outset. But the bank now comes in, and tenders the entire amount of the securities,—does not ask that it be credited on their debt, and that they receive dividends on the remainder, but tenders it as a fund to be distributed among all creditors. And the question to be decided for the trustee is, which of the two propositions is the best for the general estate,—to have the $98.14 returned into court, or accept the $350 in securities for general distribution? The matter of the securities having been fought through the courts, a lien fixed and adjudicated by the supreme court of Tennessee, and the property ordered sold to satisfy the lien, it is clear to my mind that the interest of the estate will be best subserved by accepting the tender. No fraudulent concealment of the right of action is alleged in his petition for review, etc. The only charge in the petition that would indicate a fraudulent intent to conceal the securities held by the bank is as follows: 'Said bank, with full knowledge of the fact that said two notes were holden by it as collateral securities, and the date of said bankruptcy, and, as above set out, without disclosing, but concealing, in said bankrupt proceedings the fact that it held said notes secured, petitioner insists that this was in such bad faith to the rights of other creditors of said Baber as should repel said bank from your honor's court.' The charge or allegation is tantamount to alleging that the bank knew it held the securities at the time the proofs of debt were filed, and concealed the fact; that this was bad faith, and for which they should be repelled from court. A fraudulent concealment of the securities held would repel the bank from this court, but this is not alleged in terms nor in language that can be construed into such an allegation. Fraud, like crime, must be specifically alleged. The intentionally concealing, for the fraudulent purpose of injuring or damaging another, some material fact, must be alleged, and, inasmuch as no such allegation is made, and every intendment in pleadings is taken against the pleader, it is fair to this court to presume from the face of the petition that no actual fraud was intended, and no such fraud as would or should repel the bank from this court. The allegation in the petition, 'with full knowledge of the fact without disclosing, but concealing,' is not sufficiently charged to justify the court to infer the animus,—the dolus. This being true, and the

further fact that the bank now comes in and proposes to turn over the securities held by it that are complained of, and thus do what it should have done in the beginning, and restoring to the trustee in this bankruptcy at this date all that it could have turned over to the court at the date of the filing of the proofs of debt, it thus no doubt proposes to do all that this court could or would, through its orders, force it to do. I am therefore of the opinion that the filing of the petition and further litigation, expenses, and charges against the estate in bankruptcy will be useless expenditure of money, time, and energy, and I therefore decline to allow the petition to be filed."

Joe. R. Hawkins, for trustee.
Geo. T. McCall, for Bank of Huntingdon.

HAMMOND, J. (after stating the facts). Counsel for the Bank of Huntingdon and the trustee have both applied by letter to be heard in argument upon the questions raised by this petition for a review of the action of the referee, but the matter can easily be disposed of without any argument. Technically, the bank has no right to be heard at this stage of the proceedings, and the argument would be only a matter of courtesy to the bank and its counsel. The application of the trustee is for advice and a direction of the court as to the propriety of his bringing suit against the bank by petition in this court. In the nature of the thing, the bank is not a proper party to such an application by the trustee. It might become a party, under some circumstances, by a proper order of the court; but this proceeding has not progressed to that extent. Therefore, as the bank cannot be bound by any action taken by the court upon this application of the trustee, strictly speaking it has no right to be heard in argument. The court will be very glad to hear the learned counsel for the bank whenever the questions that may be made against it are to be adjudicated.

Notwithstanding that this is only an application by the trustee for instructions, the referee has heard the parties, and taken the proof, and decided the case between the bank and the trustee as if it were presented for final decision. The court cannot approve this action of the referee; nor, if the matters were properly presented for decision, is the court quite prepared to say that it would approve the judgment of the referee; but the truth is the questions between the trustee and the bank are not ripe for decision. The application of the trustee for advice and instructions of the court ought to have been denied, and, if a proper application were made by any creditor for the purpose, it is not impossible that the trustee ought to be removed, and another substituted, who is not so squeamish about the proper discharge of his duties, and not so timid about taking responsibility. That which the trustee should have done was to engage competent counsel to advise him, submitted the facts of his controversy with the bank to such counsel, and followed his advice in the matter of bringing whatever suit was necessary against the bank, or taking such other steps as he might be advised  If not in funds to pay counsel, he should have notified creditors of that fact, and, if necessary, ask the referee or court to call a meeting of the creditors to advise him of their wishes in the premises, and to act accordingly. The court has a strong suspicion, from the facts shown in this record,

that the trustee is acting disingenuously in making this application, and for the purpose of favoring the bank. It appears that the trustee is a brother of the cashier of the bank, who acted for the bank in the transaction involved. It is fairly to be inferred that this brother of the cashier received his appointment as trustee through the preponderating vote of the bank at the first meeting of the creditors. It would seem singular that he would remain in ignorance from the date of his appointment, in December, 1900, to the 14th day of August, 1902, of the fact charged in the petition that the bank had fraudulently concealed its possession of collateral securities for its debt, and that it had during that time carried through the chancery and supreme court of the state a proceeding to enforce the lien of its collateral securities upon the lands of Hardin. Why did the trustee not proceed against the bank more promptly? The record does not answer this question, except with a suspicion as above indicated. It does not appear whether the learned counsel who prepared the petition of the trustee now offered to be filed was engaged by the trustee to represent him, or is representing creditors seeking to call the bank to account for its alleged fraud in withholding the knowledge of the fact that it held the collaterals, of proving its debt without security, collecting full dividends without disclosing the truth, and at the same time trying to enforce the lien of the collaterals in the state court. But on the facts as shown in the petition it is preposterous that any trustee understanding his duty should not have proceeded against the bank as soon as the facts came to his knowledge. That he should refuse to sign and file this petition on the advice of this counselor, by whomsoever he was employed, until he should be instructed by the court to do so, seems to be, on the facts as shown by this record, disingenuous, to say the least of it. Undoubtedly, by the very terms of the bankruptcy statute, the trustee acts at all times technically under the direction of the court, and no doubt he has on proper occasions and under proper circumstances, the right to apply to the court for its instructions in the premises. Section 47(2). But this does not mean that he can shovel the administration of his trusteeship into the court, unload his responsibility upon the referee, or judge of the court, and evade or shirk his plain duties by asking the advice and directions of the court. Properly, he should be a man of affairs, ready to act upon his own responsibility and intelligence, as business men do in their own affairs; if necessary, resort to the advice of counsel; and, still more, if the further necessity exist, resort to the tribunal of the body of the creditors assembled in general or special meeting called for the purpose under the presidency of the referee or judge, as provided in the scheme of the act. It is for such purposes that meetings of the creditors are provided for, and, until resort has been had to these appliances to guide his judgment, and complications of a serious nature have arisen, it is disserviceable that a trustee should be applying to the court for its instructions and advice.

There is no provision in our bankruptcy statute, as in the English statute, specially authorizing trustees in bankruptcy to apply to the court in manner prescribed for direction in relation to any particular

matter arising under the bankruptcy. William, Bankr. 294, 467. But there is no doubt that such authority may be implied from the general scheme of the act of congress, and especially from section 47(2), where the duty is prescribed of collecting and reducing to money the property of the estate "under the direction of the court"; but, as before remarked, this does not mean that the trustee may devolve the administration of the estate upon the court by such applications. There was a similar provision as to all general trustees under Lord St. Leonard's Act (22 & 23 Vict. c. 35, § 30), but it was held under that act that the court would not adjudicate in that way upon doubtful points of fact or law, the decision of which would materially affect the rights of parties interested. When the trustee asked, under that act, for instructions, the court would require notice to be given to the parties interested, and, if it required formal suit between the trustee and the adverse parties, the court would remit the trustee to such action as he ought to bring under the advice of counsel. Lewin, Trusts, 352, § 28; Id. 618, § 18; Id. 620, § 23. We have the same rule in this country, which is thus expressed: "The trustee will not be permitted to seek the advice of the court upon a mere question of law about which he should have consulted an attorney, or, if necessary, tested the question by an action at law." 27 Am. & Eng. Enc. Law (1st Ed.) 153, citing Greene v. Mumford, 4 R. I. 313.

It is not necessary to particularly inquire in this place as to the limitation upon that authority in the practice of giving advice or instructions by courts of equity to trustees by contract or private appointment, such as donees of powers, executors, and the like, quasi official trustees,—as administrators, guardians, and the like; for a trustee in bankruptcy is not that kind of a trustee. Neither is he quite the same as a receiver of a court, although there is more analogy here than in the cases of trustees by contract applying to a court of equity for instructions. The rule of practice as to such applications by a receiver is laid down in Fost. Fed. Prac. (3d Ed.) p. 549, § 248, where the author quotes from a decision in the case of Missouri Pac. Ry. Co. v. Texas & P. Ry. Co. (C. C.) 31 Fed. 862, as follows:

"If there are parties in interest, and they have their day in court, the advice may be decisive. But if the matter is ex parte, the value of the advice depends largely upon the information and the ability of the judge, and is probably binding only on the receivers, for the judge may change his mind on hearing full argument."

See, also, Fost. Fed. Prac. (3d Ed.) 542, 557, and Bates, Eq. Prac. § 614.

It will be seen from these and other authorities that the privilege of trustees to apply for advice cannot be abused by running to the court to settle every question that may appear to an irresolute trustee to be desirable to have settled without responsibility of action on his part. Nor can this practice be resorted to for the purpose of carrying on litigation between himself and adverse parties in such an informal and irregular way as has been done in this case. Trustees in bankruptcy are sui generis. As was said by Judge Purnell in the

case of McLean v. Mayo (D. C.) 113 Fed. 106, 7 Am. Bankr. R. 115:

"While the bankruptcy act creates the office of trustee in bankruptcy, such trustee is a quasi officer of the court in a qualified sense. He is in reality elected by, and represents the creditors of, the bankrupt, under the provisions of the bankruptcy act. The bankruptcy court will protect the trustee in the discharge of his quasi official duties; but as the representative of the creditors his duties as such representative must be discharged, not as an officer of the court, strictly speaking, but as provided in the bankruptcy act."

He is not, like a receiver, a mere caretaker and manager of the estate to execute the orders of the court in the progress of administration, but he is the agent of the creditors, selected by them as a man of affairs to conduct the business of collecting the assets and distributing the proceeds among the creditors. The statute invests him with the title of the bankrupt, and makes him not only quasi owner, but the owner pro hac of all the property and rights of action belonging to the bankrupt. The management of the estate is committed to his discretion, and he is expected to exercise his powers and discharge his duties with the same intelligence that an owner would do, subject, of course, primarily, to the supervision of the creditors in their meetings called for the purpose, and the whole administration subject to the supervision of the court of bankruptcy. The proceedings are not conducted, like insolvency proceedings in the chancery courts of Tennessee, by a receiver, under the constant orders of the court, and who can do nothing, scarcely, without the previous direction of the chancellor; but the proceedings in bankruptcy are to be conducted according to the specific directions of the bankruptcy statutes and the rules and the forms prescribed by the supreme court. It is a comprehensive scheme of administration by the creditors through their trustee, with which the court interferes as little as possible. He may employ counsel, using such judgment as an ordinary man would use in the transaction of his own business (In re Abram [D. C.] 103 Fed. 272, 4 Am. Bankr. R. 575); and he may apply to the creditors for authoritative advice and instructions, and for assistance with money if in the conduct of litigation he be without funds (In re Arnett [D. C.] 112 Fed. 770). Under such a statutory system as this the necessity for applications to the court for its instructions and advice should be very rare, and would arise only under somewhat extraordinary circumstances.

As appears from this record, the real question in this case is whether or not, upon a proper application by the trustee, the bank should not have its proof of claim entirely expunged and disallowed because of the alleged fraud set forth in petition offered to be filed, and be required to refund the whole of the dividends which it has received, and be not allowed to participate in the assets at all, leaving the collaterals in its hands for what they may be worth; or, if the creditors shall so determine, they might direct the trustee to compromise this demand upon the bank by allowing it to surrender its collaterals and prove its whole debt, as the bank offers to do in this record by the tender that was made to assign the decree for the collateral notes to the trustee; or to make any other settlement

that may be agreed upon between the bank and the creditors, notwithstanding the alleged fraud. It is not impossible that the bank may be able satisfactorily to explain the circumstances, and relieve itself of the imputation of fraud such as would justly forfeit its right to prove its claim under section 57 of the bankruptcy statute. And what is here said has been said with a full understanding that the bank has not yet been heard to make such explanation. It is open to the bank and to the creditors to settle these matters through the action of the trustee under the guidance of the creditors' meeting by any compromise they may agree upon. Or the creditors may instruct the trustee to proceed to expunge the claim of the bank, and insist upon the right of forfeiture of any share in the assets. The referee undertook, without any application by the trustee to that end, or without his consultation with the creditors, to accept the informal tender of the bank of its recovery against the landholder to enforce the lien of the collateral notes, and leave the bank to retain its dividends already received, and to take such other dividends as may be coming to it on such a settlement. There are no proceedings before the referee that would authorize him or the court to take such action. The trustee did not ask the court for instructions generally as to what he should do with this controversy with the bank, but only to be instructed whether he should sign a proposed petition in his behalf, prepared by his counsel or the counsel for the creditors; and that was the only question before the referee. It did not yet present a case, nor any occasion for an adjudication of the rights of the trustee against the bank; and the decision of the referee should have gone no further than to advise the trustee whether he should take the particular proceedings against the bank as suggested. And that was a question that ought to have been left by the referee's decision to the trustee's own discretion, under his responsibility to the creditors and the court for the wrongful exercise of that discretion; or else he should have been advised to apply for a meeting of the creditors to submit to them the decision of the question as to what steps should be taken against the bank, or whether a compromise should be made, and, if so, what compromise, just as was done in the case of Arnett, supra, to the rulings of which in such matters I desire to adhere, where the estate is of sufficient value to justify the expense.

It may be remarked that the theory of the petition propounded by the trustee, also that indicated by the tender of the bank, and possibly the theory accepted by the referee, namely, that the bank was under an obligation to surrender its securities, does not certainly appear upon the facts shown in the record to be tenable. The petition, on the face of it, does not set up any facts showing a fraudulent preference, and the assignment of the collateral notes to the bank appears to have been more than four months before the bankruptcy, and, if the circumstances were such that the assignment of the collaterals to the bank was a fraudulent preference outside the four-months limitation, the petition has not been definitely drawn to show or plead that fact. It is, however, unnecessary, in the view the court has taken of the case, to consider that question, as it will be

open to the trustee to shape any petition he may hereafter file against the bank as he may be advised, and claim any relief to which he may possibly be entitled. Much may depend in the exercise of his discretion upon the value of the recovery that has been had upon the collateral notes by the decree of the chancery court in its relation to the value of the land. It may be worth less than the amount of the decree, and very little, after paying the expenses of the litigation, including the attorney's fee as provided in the tender of the bank. It may be a mere empty offer on the part of the bank. This matter requires careful attention by the trustee and his legal adviser, and by the creditors at any meeting that may be called to consider the proposals made by the trustee, under the guidance of his legal adviser, to the creditors. Also it will require that the trustee and his legal adviser shall carefully determine whether this offer of the tender by the bank is one of mere compromise, or one of obligation on the bank to make and the creditors to accept. It will require, too, the careful attention of the trustee and his legal adviser to determine whether the trustee can claim for the creditors both a return of the dividends and a surrender of the collateral notes, now in the form of the decree recovered in the chancery court; or whether the trustee's remedy, outside of a mere compromise with the bank, is not strictly confined to a demand for a return of the dividends paid to the bank, and the expunging of the bank's proof of debt alleged to have been fraudulently made, and the consequent total disallowance of any share in the assets by the bank because of that alleged fraud. The holding of the referee that the petition proposed does not sufficiently plead any fraud on the part of the bank might be met by the fact that the circumstances showing the fraud are pleaded, and it is not necessary to use mere epithets to properly plead it. The petition states the facts of concealment, and it would be for the bank to show by its answer how the concealment could be otherwise than intentional. And, if intentional, it would be fraudulent, whether the bank knew it to be so or not, as all are presumed to intend the consequences of their unlawful act. Ignorance is not always a defense against unlawfulness; nor are good motives; and cannot always condone the injury done to the victim of the wrong that was done.

The court is of opinion that the referee was not authorized to decide any of these questions as the record was made before him, and that their decision here would be premature. They can only be made upon proper pleadings, issues, and proof, in a litigation between the trustee and the bank by petition and answer in the bankruptcy proceedings. An order will be entered to set aside the rulings of the referee, and dismissing the application of the trustee for the advice and instructions of the court in the premises, leaving him to take such action as he may be advised by counsel or a meeting of the creditors. Any creditor aggrieved by any neglect or refusal of the trustee to properly discharge his duty in the premises may apply to the court for his removal and the substitution of a trustee who will not hesitate to perform his plain duty under the bankruptcy statute.

Ordered accordingly.