BURCO, Inc., v. WHITWORTH et al. (LAUTENBACH et al., Interveners)

(two cases).*

Nos. 3983, 3991.

Circuit Court of Appeals, Fourth Circuit.

Feb. 22, 1936.

---

*Certiorari denied 56 S.Ct. 670, 80 L.Ed. —.

D. Heyward Hamilton, Jr., of Baltimore, Md., and Ralph P. Buell, of New York City, for appellant.

James Piper, of Baltimore, Md. (Francis J. Carey and Huntington Cairns, both of Baltimore, Md., Edwin F. Blair and J. Paschall Davis, both of New York City, and George S. Newcomer, of Baltimore, Md., on the brief), for appellees trustees' of Estate of American States Public Service Co., debtor.

John W. Davis, of New York City, for appellee Ferd Lautenbach, intervener.

Carlyle Barton and H. Warren Buckler, Jr., both of Baltimore, Md., for appellees Francis E. Frothingham, Martin C. Remer, and Samuel Wagner, Jr., Reorganization Managers and, as such managers, interveners.

Thomas G. Corcoran, Sp. Asst. to Atty. Gen., and John J. Burns, Gen. Counsel, Securities and Exchange Commission, of Washington, D. C. (Stanley Reed, Sol. Gen., of Washington, D. C., Benjamin V. Cohen, Sp. Asst. to Atty. Gen., and Roger S. Foster, Allen E. Throop, Henry A. Herman, Nathaniel L. Nathanson, Joseph A. Fanelli, and Joseph L. Rauh, all of Washington, D. C., on the brief), amici curiæ for United States of America and Securities and Exchange Commission.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

In this proceeding for corporate reorganization under section 77B of the National Bankruptcy Act (11 U.S.C.A. § 207) instituted in 1934, the question arose upon the passage of the Public Utility Holding Company Act of 1935 (15 U.S.C.A. § 79 et seq.) whether the trustees of the debtor corporation should comply with the act as a valid exercise of Congressional power. Being advised that the act was unconstitutional, the trustees sought the instruction of the District Court, and two petitions were filed by intervening creditors who disagreed as to the validity of the act, one opposing and one favoring a compliance with its provisions. The District Court set the petitions down for hearing and caused notice to be sent to the Securities and Exchange Commission and the United States Attorney for the District of Maryland. The commission and the United States came in as amici curiæ, and suggested that the court should not decide the issue, but should dismiss the petitions. The court retained the petitions, heard argument on the merits of the controversy, in which the United States and the commission participated by written brief, and decided that the act was unconstitutional and should not be observed by the trustees. These appeals followed, and the United States and the commission came into this court also as amici curiæ and by both oral and written argument urged that the appeals be dismissed. Their attorneys were requested by this court to assist it by participating also in the argument on the constitutional question, but they refused to do so.

American States Public Service Company, the debtor, is a holding company incorporated in Delaware, having its principal place of business at Baltimore. Its outstanding securities in the hands of the public are $7,575,400 of first lien 5½ per cent. gold bonds, $3,328,700 of ten-year 6 per cent. gold debentures, 16,622 shares of $6 cumulative preferred stock, 100,578 of class A stock without par value, and 99,729 shares of class B stock without par value. Substantially all of the first lien bonds and debentures were distributed or made the subject of public offerings after January 1, 1925, and a substantial part of them on October 1, 1935, was owned or held by persons residing in various states. The reproduction costs less depreciation as of June 1, 1935, of the physical property of the subsidiary companies was appraised at $7,669,663 by engineers appointed by the District Court. The total debts are $11,628,824.

The debtor is a holding company only. As shown by the findings of the District Court, the trustees, by virtue of their office, own, control, or hold with power to vote all the outstanding voting securities of eight corporations. One of these, American States Electric Company, is a holding company which in turn owns, controls, or holds all the voting stock of four companies, and one of these, Hydro Power Company, is also a holding company which in turn owns, controls, or holds all the voting stock of one corporation. Each of these holding companies as well as the debtor conforms to the definition of a hold-

ing company under section 2 (a) (7) (A) of the statute, 15 U.S.C.A. § 79b (a) (7) (A), since it owns, controls, or holds with power to vote 10 per cent. and more of the outstanding voting securities of a public utility company as defined in the act. The trustees also constitute a holding company within section 2 (a) (7) (B), 15 U. S.C.A. § 79b (a) (7) (B). The associated utility companies comprise five electric utility companies, four electric and water utility companies, and two water utility companies. The companies which handle electricity are public utility companies within the meaning of section 2 (a) (5) of the statute, 15 U.S.C.A. § 79b (a) (5). The facilities of each of these eleven subsidiary companies are situated entirely within the boundaries of a single state which, in each case, is the state of incorporation. None of them transmits or distributes electric energy other than that generated or purchased by it in such state, and none of them transmits or sells any electric energy outside the boundaries of the state or is engaged in any business in interstate commerce. Likewise none of them obtains or supplies water, or conducts any sewerage business outside the boundaries of the state. None of them is engaged in any business other than the electric business or the electric, water, and sewerage business. Neither the debtor, nor either of the subsidiary holding companies itself generates, purchases, transmits, or distributes any electric power, and neither is engaged in any other business except that of a holding company.

There are seven separate purely intrastate systems, one in Michigan, one in Indiana, one in Montana, one in Oregon, two in Idaho, and one in California. The facilities of these systems are not capable of being physically interconnected or operated as a single interconnected and coordinated system. Hence these systems are not capable of being joined together so as to become an integrated public utility system which is defined in section 2 (a) (29) of the act, 15 U.S.C.A. § 79b (a) (29), as applied to electric utility companies, as a system consisting of one or more units or generating plants, transmission lines, or distributing facilities whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection. The separate utility systems described do not compete with each other, and it is physically impossible for them to do so.

The business of the debtor before June 8, 1934, and of the trustees since that date, has consisted in holding the capital stock and other securities of the subsidiaries, receiving interest and dividends, keeping books of account, visiting and inspecting properties of the subsidiaries, and disbursing net earnings therefrom to the creditors and stockholders. Communication with the subsidiaries is made through use of the various instrumentalities of interstate commerce and of the mails, and resort to these mediums is had in the transaction of their respective businesses. In the management of the estate, the trustees use the mails and travel across state boundaries by rail and air. Neither the debtor nor the trustees have had any service sales or construction contracts of any kind with the subsidiaries or with any one else. There are, however, intercompany open accounts.

On June 8, 1934, the debtor filed a petition for reorganization under section 77B of the National Bankruptcy Act, 11 U.S.C.A. § 207, in the District Court at Baltimore. The petition was approved, trustees were appointed by the District Judge, and a plan of reorganization, later withdrawn, was filed by the debtor. On July 19, 1935, the District Judge approved the selection of reorganization managers for the purpose of supervising the deposit of securities of the debtor, the solicitation of acceptances, and the carrying out of a second plan of reorganization then before the court; and also approved the expenditure of not more than $5,000 for the expenses of the reorganization managers in the performance of their duties, and the payment to dealers, subject to the confirmation of the plan, for expenses and compensation in connection with the solicitation of deposits and acceptances of one-half of 1 per cent. of the amount of securities deposited. Notice was given to the creditors and stockholders of a hearing to be held on September 20, 1935, to consider the confirmation of the plan. On August 15, 1935, a committee representing at least 25 per cent. of the first lien bondholders filed another plan of reorganization known as the "Swart plan" and this also was set down for consideration on the same day.

For our purposes, the differences between the two plans are immaterial, but

it is important to note that both contemplate the continued existence of the debtor or a reorganized company as a holding company, which will continue to hold more than 10 per cent. of the outstanding voting securities of the various public utility companies above referred to (and would therefore be a holding company under section 2 (a) (7) of the act), and both plans contemplate the issuance of securities not confined to a single class of common stock and bonds secured by a first lien upon physical property; neither restricts the operations of the holding company system as reorganized to a single integrated public utility system, and neither proposes that the plan shall be approved by the Securities and Exchange Commission prior to its submission to the District Court. The significance of these facts as showing the impracticability of complying with the statute in a reorganization of the debtor is hereinafter considered. Neither plan has received the support requisite for adoption under section 77B.

This was the situation when the trustees, after the passage of the Public Utility Act of August 26, 1935, filed the petition which gave rise to this proceeding. The petition set out and the supporting testimony showed the facts above mentioned as to the corporate structure and business activities of the debtor and its subsidiaries. It was also alleged that both the debtor's plan and the Swart plan contemplated, and any feasible plan would require, the formation of a new company to acquire the stock, bonds, and notes of the subsidiary electric utility companies; and that for reasons to be hereinafter examined, such an acquisition could not be accomplished under the terms of the act, and that therefore the reorganization of the debtor was impracticable if the statute was valid.

It was also pointed out that section 5 (a) of the act, 15 U.S.C.A. § 79e (a), provides that on or after October 1, 1935, any holding company may register by filing a notice of registration with the Securities and Exchange Commission, in such form as the commission may require; that section 5 (b), 15 U.S.C.A. § 79e (b), provides that every registered holding company shall file with the commission within a reasonable time to be determined by the commission a registration statement giving detailed information as to the charter, trust indentures, mortgages, under-

writing arrangements, balance sheets, and profit and loss statements for the preceding five years, and other information with respect to the holding company and its associate companies; that in order for the trustees in this proceeding to comply with these provisions, an expenditure of substantial sums of money would be required; and that, unless registration should be made by them, it would be unlawful after December 1, 1935, under section 4 (a) of the act, 15 U.S.C.A. § 79d (a), to engage in certain activities essential to the management of the trust estate and the completion of either of the plans of reorganization above mentioned or any other plan that might be proposed, for example, the distribution or exchange of any security of the holding company or of any subsidiary company thereof by the use of the mails or any instrumentality of interstate commerce; and that the willful violation of any provision of the act by any person was punishable under section 29 thereof, 15 U.S.C.A. § 79z—3, by a fine of not more than $10,000 or imprisonment for not more than two years, except that in case of violation of section 4 (a) by a holding company not an individual, the fine imposed should not exceed $200,000.

Referring to the authorized expenditure of $5,000 to defray the expenditures of the reorganization managers in securing acceptance of the debtor's plan, the trustees showed that $1,500 had been expended and that payments and allowances to dealers, also authorized by the court in case of confirmation of a plan, would be substantial in amount if a plan should be carried into effect; and that the expenditure of the balance of said sum of $5,000 and the other payments mentioned, if made, would constitute a waste of assets of the estate if the trustees were required to comply with the Holding Company Act as a valid statute; because reorganization of the debtor could not be effected under its terms. They averred, however, that they had been advised by counsel that the act was void and unconstitutional, and they therefore prayed the court to determine the question of constitutionality and instruct them in the further performance of their duties and direct them to notify the Securities and Exchange Commission of the filing of the petition.

On the same day, September 16, 1935, the court granted the petition of Ferd

Lautenbach, a holder of debentures of the debtor in the sum of $2,500, for leave to intervene. He alleged that he had filed a written acceptance of the debtor's plan and that unless this or some other plan of reorganization should be adopted, a liquidation of the debtor and a sale of its assets at great loss to the creditors would be inevitable. He agreed that the act was unconstitutional and prayed that the trustees be directed not to register with the commission, but to continue the advancement of moneys in furtherance of the debtor's plan as theretofore ordered.

On the same day, Burco, Inc., a creditor holding $150,000 of the first lien bonds of the debtor, also petitioned for leave to intervene. It admitted the allegations of the trustees as to the corporate structure and activities of the debtor and its subsidiaries, but alleged that the act was constitutional; and that unless the trustees should register and comply with its provisions, it would be impossible either to advance a plan of reorganization and secure the acceptance thereof, or to liquidate the debtor's estate without irreparable loss. Burco, Inc., therefore prayed that the trustees be directed to register as a holding company under the statute and in all respects to conform with its requirements. These petitions to intervene were granted, the questions raised were set for hearing on September 27, 1935, and the trustees were directed to mail a copy of the order and of the three petitions by registered mail to the Securities and Exchange Commission at Washington, to the United States Attorney for the District of Maryland, to counsel for the Bondholders' Protective Committee, and to counsel for the reorganization managers; and this was done. On September 26, 1935, the debtor corporation filed an answer in the proceeding admitting the allegations contained in the petition of the trustees and setting up further information as to the corporate organization and activities of the subsidiary companies.

In response to the notice, the United States and the Securities and Exchange Commission came into court by attorneys, obtained leave to appear as amici curiæ, and suggested that the petitions of the trustees and the interveners be dismissed on the ground that the issues of fact and law involved had been framed not to meet the immediate exigencies of the debtor's estate, but to obtain an abstract or advisory determination of the constitutionality of the Public Utility Act; that in fact, the proceeding was collusive in that there was no genuine controversy between truly adverse litigants; and that even if the controversy was genuine, it was not justiciable; and that if justiciable, it was premature since no direct and immediate right of any party was in danger of infringement. Later it was also suggested that the trustees, holding their office and exercising their powers by virtue of section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, had no ground to complain if Congress by another statute denied them the right to use the bankruptcy machinery to effect certain kinds of reorganization.

The court thereupon proceeded to take evidence with regard to the origin of the proceeding and the relation of the parties thereto. The government's attorneys participated in the examination of witnesses, and the following facts were disclosed: The trustees had been advised by James Piper, their attorney, that if the act was constitutional, the debtor's plan of reorganization could not go forward, and further expenditures of money for the promulgation of the plan would be a waste of the assets of the estate, and the trustees should at once assemble the data necessary for registration under the act and prepare for the inevitable liquidation of the estate; but that, in his opinion, the act was unconstitutional and that it would be safe for them to ignore its provisions and proceed with the plan, if the court should so decide. He therefore advised the trustees to petition the court for instructions.

With this purpose in view, John W. Davis was requested to assist in the presentation of the question to the court. He had given an opinion that the act was unconstitutional and had already been employed by large utility interests to attack it. He willingly accepted the opportunity presented for an early decision, upon the condition that some creditor who had filed a claim in the proceeding would authorize him to appear. Such a creditor, not previously known to Mr. Davis, was found by Mr. Piper's office in the person of Dr. Ferd Lautenbach, and upon his authority, Mr. Davis prepared and filed the intervening petition.

Mr. Piper was also acquainted with Ralph P. Buell, attorney for Burco, Inc., which had previously filed its claim in the proceeding. Believing that the debtor's plan was unfavorable to his clients, Mr. Buell had indorsed the Swart plan; but later, learning that the Swart plan could not be put through, he concluded that the interests of the first lien bondholders would be best served by forcing a liquidation of the debtor corporation. He tried without success to get Mr. Piper to agree to such a plan of action during the period whilst the act was pending as a bill in Congress. Mr. Buell was not in sympathy with the policy of the legislation, but after its passage, came to the conclusion reluctantly that it was constitutional and advised his clients to comply with it. When he learned from Mr. Piper that the trustees were about to seek a determination of the question from the court, he expressed a desire to support the act in order to secure the liquidation which he regarded as beneficial to his clients. Arrangements were therefore made between the several parties and the court that the petitions of the trustees and intervening parties should be filed so that the question at issue might be decided. The facts alleged in the petition of the trustees were not open to dispute since they related merely to the capital structure of the several corporations and the character and locality of the activities of the companies controlled by the debtor. They were supported by proof in the District Court and it is not suggested in this proceeding that they are not true. There was no difference between the parties as to the facts or as to the proper interpretation of the act, but as to the constitutionality thereof a sharp issue was raised.

After argument and consideration of the facts, the District Judge in an opinion filed November 7, 1935, In re American States Public Service Co., 12 F.Supp. 667, held that a genuine controversy existed, and that there was no collusion between the parties to fabricate an imaginary issue in order to secure a decision of the constitutional question. There was, of course, no controversy between the trustees and the intervener Lautenbach, for both sought a holding that the act was unconstitutional. The important inquiry was whether there was a real or simulated conflict of interest between the trustees striving to put through a plan of reorganization, and Burco, Inc., which believed that a liquidation would better serve the interests of the first lien bondholders. The uncontradicted testimony was that the contest was genuine; and the District Judge, who had come into contact with the parties during the administration of the estate and heard the witnesses, reached the conclusion that the suspicions of the representatives of the government were without foundation and accepted the evidence as true. We have considered the evidence and have reached the same conclusion.

The government relies in this respect upon Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176, in which the court held that it would not consider the constitutionality of a state act regulating passenger fares of the railway company in a friendly suit in which the only testimony with regard to the effect of the legislation upon the earnings of the company consisted of the opinion of two witnesses furnished by the company. There was no attempt by the parties to examine the facts with relation to the difficult question growing out of the reasonableness of the rate, and the court therefore had no foundation of fact upon which to base its decision. In the pending case, however, the basic facts are simple and not open to dispute; and we think that the general rule stated in the Wellman Case applies, that whenever in the pursuance of an honest antagonistic assertion of rights there is presented a question involving the validity of any act of a Legislature, state or federal, the court must determine whether the act is unconstitutional or not.

We are of the opinion also that the question of constitutionality was presented to the court in a justiciable controversy which must exist in order to justify the exercise of the judicial power under article 3, section 2, of the Federal Constitution. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246. The proceeding for the reorganization of the debtor was a case or controversy which arose under section 77B of the National Bankruptcy Act. Under this section, the court possessed the same powers as it would have had upon a voluntary petition in bankruptcy, section 77B (o), 11 U.S.C.A. § 207 (o), or upon the appointment of a receiver in equity, section 77B

728

(a), 11 U.S.C.A. § 207 (a); and the trustees had the powers of a trustee in bankruptcy, section 77B (c) (2), 11 U.S.C.A. § 207 (c) (2). The trustees were entitled to ask for instructions and the court to give them when the Holding Company Act passed and doubts as to its validity and interpretation arose. Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Imperial Assurance Co. v. Livingston (C.C.A.) 49 F.(2d) 745, 748; Board of Road Commissioners v. Keil (C.C.A.) 259 F. 76.

■ The duty of the District Court to instruct the trustees as to their course was unavoidable. It was necessary to decide whether they should register under the act in order to avoid violation of section 4, 15 U.S.C.A. § 79d, which makes it necessary for any holding company, which is to continue in business pursuant to a reorganization plan, to register before acquiring the assets of its predecessor; and also to decide whether under the act any plan of reorganization of the debtor's properties was practicable, a matter further discussed below. If reorganization was impracticable, the expenditure of money to that end would be an unjustifiable waste. Moreover, it was necessary to determine whether in case of registration, any proposed plan of reorganization should be approved by the commission prior to its submission to the court, and should be accompanied by a report of the commission in any solicitation of consents under sections 11 (f) and 11 (g) of the act, 15 U.S.C.A. § 79k (f, g). So much doubt as to the validity of the act was publicly expressed, that on October 9, 1935, after the trustees' petition was filed and after the hearing in the court below, the commission promulgated its rule 4, declaring that any person filing any notification or statement pursuant to the act or the rules of the commission might include therein a reservation of its constitutional or legal rights; and after the decision of the court, the Attorney General on November 21, 1935, gave notice that it was the intention of the government to institute civil proceedings against one or more important companies who might fail to register so as to enforce its provisions and secure a decision from the Supreme Court on the validity of the act; that in the meantime, it was not proposed to institute criminal proceedings, or later to seek to exact penalties for earlier offenses which might unduly penalize the investors in an offending company. Such a suit was instituted on November 26, 1935, in the Southern District of New York against the Electric Bond & Share Company and others; but despite these efforts on the part of the government, a multitude of suits were brought against the government by utility companies. Confronted by the situation before it, the District Court was obliged to decide whether or not the trustees should comply with the terms of the act. It is noteworthy that the Supreme Court in Ex parte Garland, 4 Wall.(71 U.S.) 333, 18 L.Ed. 366, considered an act of Congress affecting the qualification of attorneys practicing in the United States Court and condemned it as unconstitutional, although the proceeding was not strictly adversary, and the Attorney General of the United States appeared in opposition to the complaining attorney only as amicus curiæ.

It has been held that when a court instructs its officers in a nonadversary proceeding, it acts in an administrative rather than in a judicial capacity, and has a discretionary power to refuse instructions if a decision would materially and unwarrantably affect the right of interested parties. In re Sterba (C.C.A.) 74 F.(2d) 413; McCormick v. Puritan Coal Mining Co. (C.C.A.) 41 F.(2d) 213; Pennsylvania Cement Co. v. Bradley Contracting Co. (D.C.) 274 F. 1003; In re Baber (D.C.) 119 F. 520; Pennsylvania Steel Co. v. New York City Ry. Co. (C.C.) 176 F. 471. In the pending case, however, the District Court reached the conclusion that the proceeding had become an adversary one; and since the controversy arose as a necessary step in the administration of the estate, the court was charged with the power and the duty to decide it, although it involved an issue of much gravity and importance and had come to its attention in an unusual form. Public Utilities Commission v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230, 93 A.L.R. 195; Nashville, C. & St. L. R. Co. v. Wallace, 288 U.S. 249, 264, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191. In Continental Ill. Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, the bankruptcy court entertained summary jurisdiction to issue an injunction in a reorgan-

ization proceeding under section 77 (11 U.S.C.A. § 205) as within its authority to make orders necessary for the enforcement of the act.

█ It was not essential to a determination of the question that the government or the commission be a party to the proceeding. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106; Employers' Liability Cases, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297; Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759; Id., 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108. Nor does it seem to us that they have been at a disadvantage on that account as counsel have suggested. They appeared in the court below as amici curiæ, but declined to intervene and become parties. They declined the offer of the trustees to make them parties by praying injunctive relief against the commission and the District Attorney. Counsel for the commission at the hearing on September 27, 1935, stated that if the debtor should fail to register, the government would come into the case as a party; but this action was not taken notwithstanding the failure to register on or before December 1, 1935. The government and the commission availed themselves of the opportunity to question the bona fides of the controversy; and they could as readily have attacked the admissions in relation to the corporate set-up and activities of the debtor and its affiliates, for these admissions related to facts easily disproved if not true. Full opportunity was also accorded the representatives of the government to argue and brief the case, and they did argue the question of jurisdiction and brief both questions in the lower court. They have also appeared in this court and participated in lengthy oral and written arguments on the subject of jurisdiction. They were requested to assist the court by arguing the more important question of constitutionality, but they refused. It may well be that for strategic reasons they prefer a different battle ground; but it is obvious they they have not labored under any substantial handicap in the present proceeding which is not inherent in the nature of the case and in the obligation of the court to decide the controversy before it.

█ The government presses with great earnestness the contention that the pending proceeding is premature because the controversy is not immediate and does not present for decision the infringement or threatened infringement of any right of any party to the record. The well-established rule is invoked that in the exercise of their jurisdiction to consider the constitutionality of a state or federal statute, the federal courts will never anticipate a question of constitutional law in advance of the necessity of deciding it, or formulate a rule of court broader than the precise facts to which it is applied. Liverpool, N. Y. & P. S. S. Co. v. Commissioners, 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899; Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; State of Texas v. Interstate Commerce Commission, 258 U.S. 158, 162, 42 S.Ct. 261, 66 L.Ed. 531.

█ In considering the question of prematurity, we must bear in mind that the trustees had to decide what their duties were in respect to certain provisions of the act. The first was the matter of registration. They were obliged to decide whether they should register on or after October 1, 1935, with the commission, as permitted in section 5 (a), 15 U.S.C.A. § 79e (a), and thereby subject the estate to the expense of subsequently filing within the time fixed by the commission the elaborate statement required by section 5 (b) of the act, 15 U.S.C.A. § 79e (b); and they had also to determine whether they or the estate would incur heavy penalty under sections 4 and 29, 15 U.S.C.A. §§ 79d, 79z—3, if they should attempt to carry out any plan of reorganization without registration. The government urges that the trustees could have given the preliminary notice of registration as required by section 5 (a) at negligible expense and without prejudice to the debtor, because it would not thereby have lost the right to challenge the constitutionality of the act, under the rule laid down in Union Pacific R. Co. v. Public Service Commission, 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131; Power Manufacturing Co. v. Saunders, 274 U.S. 490, 47 S.Ct. 678, 71 L.Ed. 1165; Terral v. Burke Construction Co., 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186; and because this doctrine was expressly recognized in rule 4 of the commission promulgated on October 9, 1935, after the institution of the suit below and reaffirmed by the commission on November 22, 1935. It is also pointed out that the trustees and the debtor were in no

danger of suffering criminal penalties by anything that they might do before the final decision of the Supreme Court on the question of constitutionality because of the announcement of the Attorney General hereinbefore mentioned. There is no reason to doubt that these official announcements will be faithfully observed; and we need not therefore consider the decisions which hold that litigants who have acted pursuant to the provisions of a statute without duress cannot thereafter attack it as unconstitutional; Great Falls Mfg. Co. v. Garland, Attorney General, 124 U.S. 581, 8 S.Ct. 631, 31 L.Ed. 527; Wall v. Parrot Silver & Copper Co., 244 U.S. 407, 37 S.Ct. 609, 61 L.Ed. 1229; United Fuel Gas Co. v. Railroad Commission of Kentucky, 278 U.S. 300, 307, 308, 49 S.Ct. 150, 73 L.Ed. 390; and that unauthorized acts of government officials cannot operate to estop the government. Wilber National Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798. Nevertheless consideration of the provisions of the statute makes it clear that there was an immediate need on the part of the trustees and the debtor to know the bearing of the act in order to formulate and put through any plan of reorganization under section 77B.

It is made unlawful by section 4 (a) of the act, 15 U.S.C.A. § 79d (a), for an unregistered holding company after December 1, 1935, to perform a number of otherwise lawful acts; for example, it is unlawful for such a company, by use of the mails or any means or instrumentality of interstate commerce, to distribute or make any public offering for sale or exchange of any security of such holding company or any subsidiary or affiliate thereof, section 4 (a) (3), 15 U.S.C.A. § 79d (a) (3); or to acquire or negotiate for the acquisition of any security or utility assets of any subsidiary of such holding company, any public utility company, or any holding company, section 4 (a) (4), 15 U.S.C.A. § 79d (a) (4); or to own, control, or hold with power to vote any security of any subsidiary company thereof that does any of such acts, section 4 (a) (6), 15 U.S.C.A. § 79d (a) (6). Section 26 (b), 15 U.S.C.A. § 79z (b), provides that every contract made in violation of the act shall be void as regards the rights of any person who, in violation of the act, has made or engaged in the performance of the contract, and as regards the right of any

person not a party to the contract who has acquired any right thereunder with actual knowledge of the facts. Section 29, 15 U.S.C.A. § 79z—3, as we have seen, imposes penalties for the breach of the act. The trustees were therefore naturally and properly concerned when they filed their petition for instruction whether they would be subject to the criminal and civil penalties prescribed, for the government's promise not to prosecute violations committed prior to the decision of the Supreme Court had not been given when the trustees' petition was filed, or indeed when the decision of the District Court was made.

Irrespective of these considerations, there were other circumstances which necessitated instructions and a decision by the District Court if the rights and privileges of the parties to propose and promulgate a plan of reorganization under section 77B were to be recognized and given effect. If the trustees of a reorganized holding company should register, certain consequences would follow under the terms of the act. It would become unlawful without the prior approval of the commission for the trustees or the reorganized company, by use of the mails or an instrumentality of interstate commerce, to issue or sell any security of the trustees or of the company, section 6 (a) (1), 15 U.S.C.A. § 79f (a) (1); or to alter the priority, preferences, or voting power of any outstanding security, section 6 (a) (2), 15 U.S.C.A. § 79f (a) (2); or to acquire directly or indirectly any securities or utility assets or any other interest in any business, section 9 (a) (1), 15 U.S.C.A. § 79i (a) (1); or to solicit any proxy or authorization regarding any security of a registered holding company or of a subsidiary company, section 12 (e), 15 U.S.C.A. § 79l (e); or to negotiate or enter into any transaction not otherwise unlawful under the act with any company in the same holding company system or any affiliate thereof, section 12 (b), 15 U.S.C.A. § 79l (b).

The kind of securities which a registered holding company may issue are strictly limited by the act. Thus it is unlawful under section 6 (a) for any registered holding company by use of the mails or any instrumentality of interstate commerce directly or indirectly to issue or sell any security of the company or exercise the right to alter the priorities,

preferences, voting power, or other rights of the holders of the outstanding securities, save in accordance with a declaration to be filed with the commission under section 7 of the act (15 U.S.C.A. § 79g); and the latter section permits a registered holding corporation to file such a declaration containing certain information, but forbids the commission to permit a declaration regarding the issue or sale of a security to become effective unless it finds, with certain exceptions, that such security is a common stock having par value and without preferences, or a bond secured by a first lien on physical assets, subsection 7 (c), 15 U.S.C.A. § 79g (c); and also finds, amongst other things, that the security is reasonably adapted to the security structure and earning power of the declarant and that the conditions of issue are not detrimental to the public interest, section 7 (d), 15 U.S.C.A. § 79g (d).

Most pertinent in considering whether it would be lawful for any reorganized holding company to acquire the securities or assets of the widely separated subsidiaries of the debtor are the following provisions of the act.

Section 9 (a) (2), 15 U.S.C.A. § 79i (a) (2), provides that it shall be unlawful for any person by use of the mails or any instrumentality of interstate commerce, to acquire any security of any public utility company, if such person is an affiliate, under section 2 (a) (11) (A), 15 U.S.C.A. § 79b (a) (11) (A), of that company or of any other public utility or holding company, unless the acquisition has been approved by the commission under section 10 of the act, 15 U.S.C.A. § 79j. Section 10 (c) (1), 15 U.S.C.A. § 79j (c) (1), provides that the commission shall not approve the acquisition of securities or utility assets which is detrimental to carrying out the provisions of section 11, 15 U.S.C.A. § 79k. Section 11 (a), 15 U.S.C.A. § 79k (a), makes it the duty of the commission to examine the corporate structure of every registered holding company and every subsidiary thereof, and the properties owned or controlled thereby in order to determine the extent to which the corporate structures may be simplified, and the properties confined to those necessary or appropriate to the operation of an integrated public utility system. Section 11 (b), 15 U.S.C.A. § 79k (b), provides that it shall be the duty of the commission as soon as practicable after January 1,

1938, to require each registered holding company and each subsidiary company thereof to take such action as the commission shall find necessary to limit the operations of the holding company's system, of which the holding company is a part, to a single integrated public utility system; provided, however, that the commission shall permit a registered holding company to continue to control one or more additional integrated public utility systems if it finds, amongst other things, that all of such additional systems are located in one state or in adjoining states. Section 10 (c) (2), 15 U.S.C.A. § 79j (c) (2), provides that the commission shall not approve such an acquisition of securities or utility assets of a public utility or holding company unless such acquisition will serve the public interest by tending toward an economical and efficient development of an integrated public utility system as above outlined.

As we have seen, an integrated public utility system, as applied to electric utility companies, means a system consisting of one or more units, whose utility assets whether owned by one or more companies are physically interconnected or capable of physical interconnection, and which may be economically operated as a single system confined in its operations to a single area or region in one or more states, section 2 (a) (29), 15 U.S.C.A. § 79b (a) (29).

The District Court held, in view of these sections of the statute, that it would be impossible for the commission to approve the acquisition of the securities of the electric utility companies described in this proceeding by a new company under any plan of reorganization. On December 23, 1935, after the decision, the general counsel of the commission published an opinion in which it was stated that an integrated public utility system, as defined in section 2 (a) (29), may be nothing more than one small local operating unit or it may be one large operating system integrating the facilities of several companies. He held that so far as section 10 (c) (2) was concerned, any acquisition which makes for economical development of the property acquired may be regarded as "tending towards the economical and efficient development of an integrated public-utility system," and that it is not essential that the property acquired be interconnected or capable of interconnection with other property under

the control of the company making the acquisition. He said that the question of the number of units in which an interest may be acquired is not governed by section 10 (c) (2), but by section 10 (c) (1), and he held that there is nothing in the terms of the act which would prevent the commission from sanctioning the acquisition by a reorganized company of several integrated systems in different localities, if the result was merely to bind together under common control property previously under such control and no others. The weight to which this opinion is entitled is affected by the circumstance that it was rendered upon a question in litigation in the courts. If accepted in its entirety, it still does not remove a serious obstacle in the way of the reorganization of the debtor corporation. The opinion does not purport to say that a holding company in acquiring the assets of the debtor in reorganization would not be required by the commission as soon as practicable after January 1, 1938, to limit its operations to a single integrated system located in one state or adjoining states. In his brief on the question of constitutionality in the District Court, the general counsel for the commission said: "Section 11 * * * in effect provides that after a specified period, registered holding companies must either cease to be holding companies by giving up their control of utility operating companies, or confine their interests to a single operating utility system (and such small minor operating units in the same locality as cannot be economically operated as independent units)."[1]

We are in accord with the opinion of the District Court on this point, for we are unable to conclude that the acquisition of the securities of the scattered subsidiaries of the debtor by a reorganized company would not impede the commission in carrying out its duty under section 11 to simplify the corporate structure of holding companies and confine their operations to integrated systems.[2] It follows that whether section 10 (c) (1) or section 10 (c) (2) is considered, any plan of reorganization would either be unlawful or so impracticable as to make liquidation at this time well nigh inevitable. The consent of creditors to the formation of a new company that would have to undergo a second reorganization or dismemberment under the orders of the commission as soon as practicable after January 1, 1938, would be difficult if not impossible to procure, even if the commission should approve it. The mere existence of a doubt as to the meaning of the act constitutes a formidable handicap in the presentation of any plan to creditors and security holders of the debtor. If the act is invalid, these restrictions need not be observed, but as long as the question of the validity of the statute remains undecided, the freedom of the parties in the formulation of a plan and in securing assents thereto is materially affected. The intervener Burco, Inc., in its petition insisted that no reorganization or liquidation would be valid which did not comply with the terms of the act, and alternately that under the correct interpretation of the act, a reorganization was entirely impossible. Whichever of these alternatives is accepted, it is obvious that the right of the parties to a prompt settlement of the reorganization proceeding cannot be enforced until the doubtful question is set at rest.

These circumstances distinguish the case from Abrams v. Van Schaick, 293 U.S. 188, 55 S.Ct. 135, 79 L.Ed. 278, upon which the government relies. That case involved the validity of a New York

---

[1] Section 11 (b) (2) would require the commission as soon as practicable after January 1, 1938, to order a reorganized company formed in this proceeding to sever its connection with the American States Electric Company, for this company is a holding company of the Hydro Power Company which in turn is a holding company of the Grimes Pass Power Company. The section directs that the commission shall require each registered holding company (and any company in the same holding company system) to take such action as the commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiaries which itself has a subsidiary company which is a holding company. It would follow that the reorganized company and the American States Electric Company could not remain parts of the same holding company system.

[2] The policy of Congress is shown in its express declaration in section 1 (b) (4) of the act (15 U.S.C.A. § 79a (b) (4) that the national public interest is or may be adversely affected when the growth and extension of holding companies bears no relation to the integration and co-ordination of related operating properties.

statute which gave the state superintendent of insurance the power to promulgate a plan of reorganization of an insurance company subject to the approval of the court and of certain interested parties. A motion for an injunction on the ground that the statute was unconstitutional was made in advance of the promulgation of a plan by the superintendent and was granted by order of the trial court. The order was reversed by the Court of Appeals of the state which held that the act was valid. People, by Van Schaick, v. New York Title & Mortgage Co., 264 N.Y. 475, 191 N.E. 522. The Supreme Court of the United States dismissed the appeal brought to it, for want of a federal question, holding that in the absence of a plan, it was a matter of conjecture whether a plan, if promulgated, would be approved as required by law or would be opposed by the appellants or deprive them of any constitutional right. In the pending case, the further progress of plans already promulgated and the formation of new plans was stayed by the enactment of the statute, and no further action was practicable until its validity was determined. This situation is not unlike that described in Continental Ill. Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 607, 79 L.Ed. 1110. In that case, no plan of reorganization had been consummated or even prepared, but nevertheless creditors were enjoined from selling collateral of the debtor held by them, because it was found that without some control over the disposition of the collateral, "the presentation of a satisfactory plan of reorganization might as well be abandoned."

■■ The government concludes its argument on the jurisdictional point with a contention that really goes to the constitutional basis of the act. It amounts to an assertion that the act should be sustained in the pending case in its relation to the debtor, on the ground that it is an exercise by Congress of its power under article 1, section 8, clause 4 of the Federal Constitution to make uniform laws on the subject of bankruptcy throughout the United States. Particular reference is made to section 11 (f) of the act (15 U.S.C.A. § 79k (f) which provides in substance that in any proceeding in a court of the United States in which a receiver or trustee is appointed

for a registered holding company or any subsidiary thereof, the court may constitute the commission as sole trustee or receiver whether or not a trustee or receiver has theretofore been appointed; and that in such proceeding, a reorganization plan for a registered holding company or subsidiary company should not become effective until the plan has been approved by the commission. The suggestion is that this section of the statute limits the kind of plan that may be approved by the court under section 77B (11 U.S.C.A. § 207), or in effect that the Holding Company Act in this respect must be taken as an amendment of section 77B, and hence that holding companies reorganized under that section are subject to the provisions of the act even if it be invalid as to other holding companies. Section 32 (15 U.S.C.A. § 79z—6), relating to the separability of the provisions of the act, creates the presumption, that eliminating invalid parts, the Legislature would have been satisfied with what remained; but this is not true if it is evident that the Legislature would not have enacted the provisions within its power independently of those beyond the scope of its authority. Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Utah Power & L. Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038. The Holding Company Act does not purport to be an exercise of the bankruptcy powers of Congress, but is a comprehensive plan to control all public utility holding companies for the reasons set forth in section 1 of the act (15 U.S.C.A. § 79a); and it is at least doubtful, whether Congress intended the act to stand, if limited to holding companies in reorganization proceedings under section 77B. However, it is sufficient to say in this respect that section 11 (f) of the act (15 U.S.C.A. § 79k (f) applies to proceedings involving holding companies which were registered under the act prior to the date on which the receiver or trustee was appointed, and to proceedings involving subsidiaries of such holding companies. The opinion of the general counsel of the commission of December 23, 1925, was to this effect. In short, this section has no bearing on the holding company in the case at bar; and the other sections of the act herein discussed, which do affect the debtor corporation, must find a constitutional basis other than the pow-

er of Congress to legislate in regard to bankruptcies.

We are told that power to enact the statute is derived from the constitutional grants to regulate commerce among the states and to establish post roads and post offices; and that the foundation of the measure upon this basis is best understood when its provisions for national control of electric and gas public utility holding companies are considered in the light of its expressed purposes. Section 1 of the act states that such companies and their subsidiaries are affected with a national public interest, in that their securities are widely marketed and distributed, their service, sales, and construction contracts are often made, and their subsidiary companies often sell and transport gas and electric energy by means of the mails and the instrumentalities of interstate commerce; that their practices in respect to their subsidiaries often materially affect interstate commerce, and their activities, extending over many states, are not susceptible of effective control by any state and make difficult, if not impossible, state regulation of public utility companies.

Section 1 (b) of the act, 15 U.S.C.A. § 79a (b), declares upon the basis of facts disclosed by reports of the Federal Trade Commission and the Committee on Interstate and Foreign Commerce of the House of Representatives, that the national public interest, the interest of investors in the securities of holding companies, and the interest of consumers of electric energy and gas are or may be adversely affected when investors cannot obtain the necessary information to appraise the financial position or earning power of the issuers; when securities are issued upon the basis of fictitious or unsound asset values; when subsidiary companies are subjected to excessive charges for services, materials, etc., and enter into transactions in which there is an absence of arm's length bargaining between them and the holding company; when control of the subsidiaries is exerted through disproportionately small investment, and the growth of the holding companies bear no relation to economy of management of the operated properties; and when the abuses described become persistent and widespread, and the holding company becomes an agency which unless regulated **is** injurious to investors, consumers, and the general public. The policy of the act is to meet these problems and eliminate these evils, and to compel the simplification of public utility holding company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems.

In the effort to accomplish these purposes, no attempt is made to regulate either the rates or the services of operating companies; and holding company systems, predominantly intrastate in character and within the protective control of a single state, are exempted, section 3 (a) (1), 15 U.S.C.A. § 79c (a) (1). The regulatory control of the act is imposed upon holding companies which use the mails or the instrumentalities of interstate commerce for certain purposes. Such holding companies, as we have seen, must register if they use these agencies to market their securities, or conduct various transactions with their subsidiaries or other utility companies to increase their holdings in their subsidiaries, or in other utility enterprises; or if they engage in business in interstate commerce, or in any of the above-mentioned activities through a subsidiary company which they control, section 4 (a), 15 U.S.C.A. § 79d (a).

Registration is effected by a simple notification thereof, section 5 (a), 15 U.S.C.A. § 79e (a); and after registration, certain obligations and restrictions upon holding companies and their subsidiaries are imposed. Pertinent information concerning their properties and operations, required as an essential basis of registration, must be filed with the Securities and Exchange Commission, section 5 (b), 15 U.S.C.A. § 79e (b); new issues of securities must receive the approval of the commission and meet the standards prescribed in the act. Sections 6 and 7, 15 U.S.C.A. §§ 79f, 79g, for example, limit the securities which may be issued by holding companies with certain exceptions to first liens bonds and to common stock having a par value and equal voting rights with any other security. The acquisition of securities of utility assets must also be approved by the commission and conform to the standards set up by the act, sections 9 and 10, 15 U.S.C.A. §§ 79i, 79j. These regulations are designed to put an end to the scattering of properties like those of the debtor, irregular financing, stock watering and stock jobbing, and complicated corporate

security relationship. Registered companies must also meet the accounting requirements fixed by the commission, section 15, 15 U.S.C.A. § 79o.

Regulation of the financial obligations of holding companies is supplemented by complete regulation of the transactions between companies within a holding company system, and between such companies and affiliated interests, when their dealings are not controlled by arm's length bargaining, sections 12 and 13, 15 U.S.C.A. §§ 79l, 79m. Thus the abuses of loans by subsidiaries to parent companies, service contracts profitable to holding companies at the expense of investors, and subsidiaries and other transactions concealing hidden profits and unfair advantages are to be eliminated.

Finally, as we have seen, section 11 of the act provides that as soon as practicable after January 1, 1938, the corporate structure of holding companies shall be simplified, the voting power fairly distributed amongst the holders of securities, and the properties confined to those appropriate to the operation of an integrated public utility system.

It is earnestly contended by the appellant, Burco, Inc., and by the government in its brief in the District Court that the act comes within the scope of the commerce clause as a regulatory device which Congress deems reasonably adapted to the public welfare. The Supreme Court has said that Congress lacks the police power and that this was reserved to the states; but that when Congress exerts any of its granted powers, the exercise may be attended by the same incidents which attend the exercise of the police power by a state and similar results may be accomplished. Hamilton v. Kentucky Distilleries & W. Co., 251 U.S. 146, 156, 40 S.Ct. 106, 64 L.Ed. 194. In such event, Congress really exercises a police power for the benefit of the public within the field of interstate commerce, Brooks v. United States, 267 U.S. 432, 436, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; and when Congress is dealing with a business affected by a public use of a national character and subject to national regulation, it may determine the nature of the evils present or threatening in the light of its general information and the evidence brought before it, and take such steps within its power as it deems necessary to effect a remedy. Stafford v. Wallace, 258 U.S. 495, 513, 516, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. Proceeding in this fashion, Congress has found that widespread and persistent abuses have flowed from the unregulated activities of holding companies by the use of the mails and the instrumentalities of interstate commerce, and has devised the Holding Company Act in the interest of investors, consumers, and the general public to prevent the further use of these agencies for improper purposes; and hence it is said that the act should be sustained, as in previous cases Acts of Congress have been upheld which deal with activities deemed by it to be prejudicial to the course of interstate commerce and the public interest.

Many of these instances were summed up in Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407, wherein the validity of an act of Congress was attacked which made it a crime to transport a stolen motor vehicle across state lines. The court said (267 U.S. 432, at pages 436, 437, 438, 439, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407):

"The objection to the act cannot be sustained. Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce. Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196, 215, 5 S.Ct. 826, 29 L.Ed. 158. In Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108, it was held that Congress could pass a law excluding diseased stock from interstate commerce in order to prevent its use in such a way as thereby to injure the stock of other states. In the Lottery Case, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492, it was held that Congress might pass a law punishing the transmission of lottery tickets from one State to another, in order to prevent the carriage of those tickets to be sold in other states and thus demoralize, through a spread of the gambling habit, individuals who were likely to purchase. In Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364, it was held that it was within the regu-

latory power of Congress to punish the transportation in interstate commerce of adulterated articles which if sold in other states than the one from which they were transported would deceive or injure persons who purchased such articles. In Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.(N.S.) 906, Ann.Cas.1913E, 905, and Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168, the so-called White Slave Traffic Act [18 U.S.C.A. §§ 397–404], which was construed to punish any person engaged in enticing a woman from one state to another for immoral ends, whether for commercial purposes or otherwise, was valid because it was intended to prevent the use of interstate commerce to facilitate prostitution or concubinage and other forms of immorality. In Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas.1917B, 845, it was held that Congress had power to forbid the introduction of intoxicating liquors into any state in which their use was prohibited in order to prevent the use of interstate commerce to promote that which was illegal in the state. In Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas.1916C, 317, it was held that Congress had power to prohibit the importation of pictorial representations of prize fights designed for public exhibition because of the demoralizing effect of such exhibitions in the state of destination.

"In Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, it was held that a federal law forbidding the transportation of articles manufactured by child labor in one state to another was invalid because it was really not a regulation of interstate commerce but a congressional attempt to regulate labor in the state of origin by an embargo on its external trade. Articles made by child labor and transported into other states were harmless and could be properly transported without injuring any person who either bought or used them. In referring to the cases already cited, upon which the argument for the validity of the Child Labor Act [39 Stat. 675] was based, this court pointed out that in each of them the use of interstate commerce had contributed to the accomplishment of harmful results to people of other states, and that the congressional power over interstate transportation in such cases could only be effectively exercised by prohibiting it. The clear distinction between authorities first cited and the Child Labor Case leaves no doubt where the right lies in this case. It is known of all men that the radical change in transportation of persons and goods effected by the introduction of the automobile, the speed with which it moves, and the ease with which evil-minded persons can avoid capture, have greatly encouraged and increased crimes. One of the crimes which have been encouraged is the theft of the automobiles themselves and their immediate transportation to places remote from homes of the owners. Elaborately organized conspiracies for the theft of automobiles and the spiriting them away into some other state and their sale or other disposition far away from the owner and his neighborhood have roused Congress to devise some method for defeating the success of these widely spread schemes of larceny. The quick passage of the machines into another state helps to conceal the trail of the thieves, gets the stolen property into another police jurisdiction and facilitates the finding of a safer place in which to dispose of the booty at a good price. This is a gross misuse of interstate commerce. Congress may properly punish such interstate transportation by any one with knowledge of the theft because of its harmful result and its defeat of the property rights of those whose machines against their will are taken into other jurisdictions."

In addition to the cases listed, reference may be made to acts forbidding the shipment of adulterated or misbranded foods or drugs in interstate commerce. Pittsburgh Melting Co. v. Totten, 248 U.S. 1, 39 S.Ct. 3, 63 L.Ed. 97; Weeks v. United States, 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513.

It is contended that these decisions show that there is a national police power, which is not limited in its exercise to the transportation of articles in themselves harmful, such as adulterated foods or diseased stock, but may include a beneficial article, such as an automobile, if Congress has reason to think that evil will result from its uses in interstate transportation; and hence Congress may take steps to eliminate the evils that may reasonably be thought to result from the interstate distribution or acquisition of un-

approved securities through interstate communications, or from the unregulated use of the dangerous holding company device.

We are of opinion that the argument is not in accord with the rule to be deduced from the decisions which hold that the mere use of the instrumentalities of interstate commerce in the transportation of commodities does not authorize Congress to regulate their local production. It should be borne in mind that neither the debtor nor any of its subsidiaries is engaged in interstate commerce. It is said that the constant interstate communication which is essential to the business of a holding company is indistinguishable from that of the correspondence school which was held to constitute interstate commerce in International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.(N.S.) 493, 18 Ann.Cas. 1103; but that case was concerned with transactions which involved the transportation of property, as the decision shows and the court subsequently pointed out in New York Life Ins. Co. v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332, and Blumenstock Bros. Advertising Agency v. Curtis Publishing Co., 252 U.S. 436, 442, 40 S.Ct. 385, 64 L.Ed. 649. Since the transactions of the debtor and its subsidiaries do not involve interstate commerce, cases which involve such activity are not controlling, e. g., Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann.Cas.1912D, 734; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; Second Employers' Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44; Houston, E. & W. Texas R. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341.

It should be noted also that the act does not merely prohibit the use of the instrumentalities of commerce for fraudulent or unfair purposes, but prohibits activities of the kind already described, whether harmful or not, in so sweeping a fashion as to make it impossible for a holding company covered by the act to carry on its business without registration and without submission to the regulation of the commission in many important particulars. In these respects the act

differs from the Securities Act of 1933, as amended by the Securities Exchange Act of 1934, 15 U.S.C.A. § 77 (b) et seq. and § 78 (a) et seq., which makes provision for the registration and examination of securities so that their character may be determined before they are issued, and those which are found to be harmful may be excluded from the channels of communication. See Securities & Exchange Commission v. Jones (D.C.) 12 F.Supp. 210, affirmed (C.C.A.2) 79 F.(2d) 617, and Securities & Exchange Commission v. Wickham (D.C.) 12 F.Supp. 245. The Holding Company Act goes much farther for it seeks not merely to control the use of the means of distribution but in many material respects the business of the user.

The scope of the Public Utility Act is in fact more extensive than any Congressional regulation of the use of the mails or the instrumentalities of interstate commerce, which has stood the test of litigation. It is not correct to say that in Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407, the Supreme Court extended the rule laid down in previous cases, that the transportation of persons or property in themselves harmful to interstate commerce may be prohibited by Congress under its power to regulate, and approved the exclusion of a harmless object from the channels of trade; for the court pointed out the danger involved in the passage from state to state of swiftly moving vehicles carrying evil men bent upon crime. The objection to the Public Utility Act is similar to that which proved fatal to the first child labor statute passed by Congress and considered by the Supreme Court in Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724. The statute was held unconstitutional on the broad ground that it was an attempt to regulate the internal affairs of the states. The court considered the rulings above cited and showed that they rested upon the exceptional character of the subjects of commerce dealt with, which justified the decision of Congress to exclude them from the channels of interstate trade. This element was held to be absent in the case before the court since the goods were themselves harmless, and the real thing intended to be accomplished by the statute was the denial of the facilities of interstate commerce to manufacturers who employed

children within the prohibited ages. It was held that the grant of power to Congress to regulate interstate commerce does not authorize it to control the states in the exercise of their police power over local trade or manufacture.

This ruling was repeated in the Child Labor Case (Bailey v. Drexel Furniture Co.), 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432, where the court held that a so-called excise tax of 10 per cent. of the net profits of businesses employing child labor was not in reality a tax but a penalty imposed for the regulatory purposes of prohibiting the labor of children in factories. In both of these cases, as in the present case, the government urged that the legislation should be upheld because the evil aimed at affected the whole Nation; and could not be effectively cured by the separate action of the several states, but only through an Act of Congress bearing upon all localities alike; but the court pointed out that it is as much its duty to strike down an unconstitutional act designed to achieve a desirable end if it is not within the power of Congress as it is to uphold an act passed in conformity with the Constitution, although the court may not perceive the wisdom of its underlying policy. Otherwise the dividing line between the powers of the national government and the powers of the states would be obliterated. The court said (259 U.S. 20, at pages 37, 38, 42 S.Ct. 449, 450, 66 L.Ed. 817, 21 A.L.R. 1432):

"The employer's factory is to be subject to inspection at any time not only by the taxing officers of the Treasury, the Department normally charged with the collection of taxes, but also by the Secretary of Labor and his subordinates, whose normal function is the advancement and protection of the welfare of the workers. In the light of these features of the act, a court must be blind not to see that the so-called tax is imposed to stop the employment of children within the age limits prescribed. Its prohibitory and regulatory effect and purpose are palpable. All others can see and understand this. How can we properly shut our minds to it?

"It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects not intrusted to Congress, but left or committed by the supreme law of the land to the control of the states. We cannot avoid the duty, even though it require us to refuse to give effect to legislation designed to promote the highest good. The good sought in unconstitutional legislation is an insidious feature, because it leads citizens and legislators of good purpose to promote it, without thought of the serious breach it will mark in the ark of our covenant, or the harm which will come from breaking down recognized standards. In the maintenance of local self-government, on the one hand, and the national power, on the other, our country has been able to endure and prosper for near a century and a half.

"Out of a proper respect for the acts of a co-ordinate branch of the government, this court has gone far to sustain taxing acts as such, even though there has been ground for suspecting, from the weight of the tax, it was intended to destroy its subject. But in the act before us the presumption of validity cannot prevail, because the proof of the contrary is found on the very face of its provisions. Grant the validity of this law, and all that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the states have never parted with, and which are reserved to them by the Tenth Amendment, would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it. To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states."

In its recent decisions, the Supreme Court has reaffirmed this position. The application of the Holding Company Act to the business of the debtor and its subsidiaries would bring about a regulation and control of local business in the field in which it relates, that would be comparable in its effect to that which the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195 (see 15 U.S.C.A. § 701 et seq.), sought to impose upon conditions of local trade, and that which the Agricultural Adjustment Act of 1933, 48 Stat. 31 (see 7 U.S.C.A. § 601 et seq.), sought to impose upon the production of agricultural products.

In the first of these acts, it was declared in section 1 (15 .U.S.C.A. § 701) to be the policy of Congress, in view of a national emergency productive of widespread unemployment and disorganization of industry, to remove the obstruction from the free flow of interstate commerce and to promote co-operative action among trade groups; and in section 1 of the second of these acts (7 U.S.C.A. § 601), it was stated that an economic emergency had arisen which had affected transactions in agricultural commodities with a national public interest and had obstructed the normal currents of commerce, calling for remedial legislation. But in both instances, the act was declared to be beyond the power· of Congress since it dealt with a subject reserved to the states. In Schechter Poultry Corp. v. United States, 295 U.S. 495, 528, 529, 55 S.Ct. 837, 842, 79 L.Ed. 1570, 97 A.L.R. 947, the court said:

"We are told that the provision of the statute authorizing the adoption of codes must be viewed in the light of the grave national crisis with which Congress was confronted. Undoubtedly, the conditions to which power is addressed are always to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power. [See Ex parte Milligan, 4 Wall. 2, 120, 121, 18 L.Ed. 281; Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481.] The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary. Such assertions of extra constitutional authority were anticipated and precluded by the explicit terms of the Tenth Amendment— 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.' "

Similarly in United States v. Butler, 56 S.Ct. 312, 323, 80 L.Ed. ——, the court said:

"It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the states.

"If, in lieu of compulsory regulation of subjects within the states' reserved jurisdiction, which is prohibited, the Congress could invoke the taxing and spending power as a means to accomplish the same end, clause 1 of section 8 of article 1 would become the instrument for total subversion of the governmental powers reserved to the individual states.

"If the act before us is a proper exercise of the federal taxing power, evidently the regulation of all industry throughout the United States may be accomplished by similar exercises of the same power. It would be possible to exact money from one branch of an industry and pay it to another branch in every field of activity which lies within the province of the states. The mere thread of such a procedure might well induce the surrender of rights and the compliance with federal regulation as the price of continuance in business."

■ Little need be added with regard to the power of Congress to establish post offices and post roads. The power has been frequently exercised to regulate practices in the use of the mails which Congress decided would be injurious to the carriage of the mails or would subject the mails to use for fraudulent or unlawful purposes. Thus it has been held within the power of Congress to prohibit the use of the mails for letters concerning lotteries, Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877, Ex parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; for the sending of scurrilous matter, Warren v. United States (C.C.A.) 183 F. 718, 33 L.R.A.(N.S.) 800; for the distribution of money in a manner which amounted to a lottery, Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092, and for the distribution of seditious articles, Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704; and Con-

gress has power to require newspapers seeking the privileges of second class mail matter to disclose their ownership and indebtedness, and to designate compensated articles as advertisements, Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190. In the case last mentioned, the power of Congress to regulate the grant of special privileges to users of the mails was sustained. In the others, it was shown that the acts performed in the use of the mails were prohibited because they were thought by Congress to be unlawful or immoral, and it was held that the power of Congress to conduct the post office establishment necessarily included the duty to exercise the power in accordance with the rules of morality. The court, however, held that the power was not absolute, but that it was subject to rights preserved in the Constitution, such as the right of privacy and freedom of the press, etc., Ex parte Jackson, supra, Lewis Publishing Co. v. Morgan, supra. In the latter case, in which the government argued that the legislative power was not subject to judicial control even though an arbitrary exclusion of mail matter should be attempted, the court said (229 U.S. 288, at page 316, 33 S.Ct. 867, 876, 57 L.Ed. 1190):

"We do not wish even by the remotest implication to be regarded as assenting to the broad contentions concerning the existence of arbitrary power through the classification of the mails, or by way of condition, embodied in the proposition of the government which we have previously stated."

Confining our attention to the specific question before the court, that is, the bearing of the Public Utility Act upon the reorganization proceeding of the debtor, it becomes clear that certain provisions of the act, if given effect, would regulate and control activities of the debtor or trustees necessary to carry out any plan of reorganization, which have no re-

lation to the protection of the mails or of the instrumentalities of interstate commerce; and the reorganization of the debtor under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207) would be prevented or unwarrantably restricted to a substantial extent. For example, it would be unlawful under the statute for the trustees to issue or distribute securities in reorganization without registration with the Securities and Exchange Commission; and if registration should be made, it would be unlawful to distribute to a new company, without the approval of the commission, and unlawful for the commission to approve the distribution to a new company of the securities of the scattered subsidiary utility companies of the debtor. No question of fraud or improper use of the mails is involved, since any plan of reorganization must meet with the approval of the District Court and be carried out under its supervision.

We conclude that the Public Utility Act is invalid in so far as it relates to the reorganization of the debtor and its subsidiaries, none of which is engaged in interstate commerce; and that the decree of the District Court should be affirmed in so far as the trustees were directed not to register with the Securities and Exchange Commission and the trustees and reorganization managers were directed to continue with the plan for the reorganization of the debtor in accordance with the orders of the court; but that the declaration in paragraph 1 of the decree that the act is unconstitutional in its entirety should be omitted.

In the appeal to superintend and revise in case No. 3983 the order and decree of the District Court is affirmed in part and reversed in part. In case No. 3991, the appeal is dismissed.

No. 3983 modified.

No. 3991 dismissed.